Lipscomb, J.
This is an appeal from the district court of Pannin county. So much of the petition as we deem at all essential in the consideration of the case is substantially as follows:
That the defendant is indebted to the plaintiff in the sum of one hundred and twenty-five dollars, lawful money; that on the 16th day of August, 1839, the defendant made his certain promissory note in writing, jointly and severally with one Spencer Asbury, signed with the proper hand of the said defendant, as well as of the said Spencer Asbury, and then and there delivered the said promissory note to petitioner, which promissory- note is now to the court shown, in the words and figures following. The petitioner then assumes to set out the note in hme verba.
*(268) “ $125.00. Six months after date, we or either of ns promise to pay R. Short one hundred and twenty-five dollars, Texas money, at its current price at New Orleans, without defalcation, this the 16th August, 1839.
«Spehcer j? Asbury,
“Mark R. Roberts.”
By which promissory note the said defendant promised to pay, six months after the date thereof, to the plaintiff, the sum of one hundred and twenty-five dollars.
The defendant filed several pleas by way of answer, but the only one material is a general denial of indebtedness. It will be seen from the bill of exceptions taken at the trial that the defendant objected to* the reading of the note on the ground of a variance between it and the copy in the petition. The plaintiff then obtained leave to strike out the copy from his petition, and read his note to the jury, and closed his testimony. The defendant offered to prove that the amount called for in the note was Texas treasury notes or their equivalent in par money, and not that amount in lawful or par money, which testimony was ruled out by the presiding judge. There was a verdict for the one hundred and twenty-five dollars and interest, and judgment accordingly.
It is to be regretted that the record was not more explicit in showing all the proceedings as they occurred. We are not informed with that certainty that should always characterize a record, as to the form of the note that was read to the jury, after the motion to strike out the copy in the petition had prevailed. This ought, at least, to have been shown by the bill of exceptions. We can presume, however, from a copy of the note in another part of the record, that it was the same as that copied in the petition, with the exception only of a mistake in the given name of the payee, setting it out as B. Short, when it is John R. Short. After the amendment by striking out the copy, the petition would remain without any other description of the note sued on than that which was given as, and supposed by the plaintiff to be, its legal effect. The defendant might, then, well have objected to the reading it to,the jury, because it should have been more accurate in the description, and ought to have shown that it was for Texas money. The question of its true construction would then have arisen, and, in strictness, this course under the pleadings would have been more correct.
The defendant then offered to prove that the amount called for in the note was Texas money. It will be remembered that there was no special answer, but only a general denial of the indebtedness; and' *(269) there might have been some question whether the testimony, as to the facts offered to be proven by the defendant, ought not to have come under a special averment in the answer. We-should have inclined to that opinion had the note been set out in its terms and not its legal effect, according to the plaintiff’s construction. The former would have advised the defendant accurately not only as to the true note he had to answer, but the construction of the terms of the note, as contended for by the plaintiff; and as our form of proceeding is designed fully to apprise both parties of the grounds of contest, it might have been contended that the defendant should have shown the nature of his defense by specially setting it out in his answer. Perhaps this would have been correct if the petition had been special, but after the supposed amendment, the petition was more defective than it was before. The plaintiff struck out too much. He did not leave a sufficient description of the cause of action. The defendant, by declining to object to the reading of the note in evidence, did not preclude himself from showing that the legal effect contended for was not true, as he might be willing that judgment should go against him for the amount that was just, according to the intention of the parties. Had he made the objection to the admissibility of the note and been sustained, it would have turned the plaintiff out of court or subjected him, in the discretion of the judge, to the terms of an amendment. He waived this and only offered to show that from the face of the note, the plaintiff was not entitled to as great an amount as he claimed. This, under the circumstances, he had a right to do; and the question is, who is to decide the point in controversy, the judge or the jury? The judge in the court below considered it a question of law and rejected the testimony offered. The decision was, doubtless, founded on a general rule of law, that the judge must give the legal construction of written contracts, and that parol testimony shall not be received to vary or change their effect. How far and in what cases such testimony, extrinsic of the contract itself, can be received, is a question on which there has been a great variety of opinion and many adjudications, since the time when Lord Bacon laid down his rule of patent and latent ambiguities. That rule when taken without qualification and exception is, that whatever ambiguity may appear on the face of the contract is patent, and cannot be explained by any extraneous evidence; and that it is the duty of'the judge to construe what is so apparently dubious and uncertain in the terms of the contract if he can do so, if not, the contract is void for uncertainty. If there is no uncertainty on the face of the contract, but could only be made so by something aside from it, it is then a *(270) latent ambiguity, and may be explained by proof of sucb facts. We will look into some eases where this doctrine has been investigated, and see what modifications, if any, have been made. In the case of Fish v. Hubbard’s Adm’r, 21 Wend. 652, the contract was “ That one party agreed to furnish. another with water of the mill-dam sufficient to carry the fulling-mill and carding-machine, and at all times to have a share of water sufficient to carry one wheel, when either of the wheels of the grist or saw mill were running,” without any description of the location of the dam or mills, or allusion to the ownership of the same. Parol evidence was admitted to explain the uncertainty.
In the case of Mundine v. Crenshaw et al. 3 Stuart, 87, the note sued on was payable to the commissioners of the town of Demopolis, without naming them. The plaintiffs were allowed to recover on proof aliunde that they were the commissioners at the date of the note, and that it was delivered to them.
In the case of Bradley v. The Washington Steamboat Company, 13 Pet. 89, on the 19th November, 1831, “ the defendant by note in writing agreed with the plaintiffs to hire of the latter their steamboat, Franklin, until the Sydney should be placed on a certain route.” Oral evidence was given, first by the plaintiffs, that the Sydney meant the defendant’s steamboat, then being built at Baltimore, and that she was not placed on the route until the 7th of February, 1832. This was not even objected to. The defendant then offered to show that the Franklin was wanted by him to ply from Washington to Potomac creek, on a certain mail route, for which, he had been contractor during several years, but on which no boat had been or could be employed after the ice had stopped the navigation; and that the Franklin was thus stopped about the 5th of December. All these facts being known to the plaintiff, who also knew the defendant was building the Sydney for the same route. The plaintiffs claimed, according to the words of the contract, “ until the Sydney was placed on the route.” But the court held that under the circumstances, neither party could be considered as meaning that the Franklin should draw wages after the carriage of the mail had become impracticable, though the Sydney should happen to be unfinished.
In the case of Thompson v. Sloan, 23 Wend. 71, the action was brought on a note of hand for twenty-five hundred dollars, payable at the Commercial Bank in Buffalo, twelve months after date, in Canada money; it was held not to be a negotiable note, and evidence of what was the meaning of Carnada money at Buffalo, where the note was made, was received. It is not conceded to be necessary or *(271) useful to refer to other American cases, decided directly on this point, nor will we inquire how far the rule as to patent ambiguities, laid down by Lord Bacon, has been observed in the English courts, farther than to cite one case.
In the case of Oolpoys v. Colpoys, Jacob, 451, the master of the rolls, Sir Thomas Plnmer, gives what he conceives to be the sense of the English cases, and says, “ the books are full of instances sanctioned by the highest authority, both in law and equity, when the person or the thing is designated on the face of the instrument by terms imperfectly Understood and equivocal, admitting of either no meaning at all by themselves or of a variety of meanings, of referring tacitly or expressly, for the ascertainment and completion of the meaning, to extrinsic circumstances.” It has never been considered an objection to the evidence of those circumstances that the ambiguity was patent — manifested on the face of the instrument.
J udge Oowen, in Fish v. Hubbard’s Adm’r, cited above, says, in reference to the rule, “ no one can deny that it is very loosely expressed, though a veneration for the great character of Lord Bacon, as a logician, has led the English judges and writers on evidence into a constant repetition of it, without often adverting to its singular generality. It never was acted on in its widest extent.” J udge Story, in reference to the English decisions under his rule, says “ that after several attempts he had found himself unsuccessful in his efforts to reconcile them.” Peck v. Dickson, 1 Mason. And there can be no doubt but every lawyer has encountered the same difficulty and found himself forced to the same conclusion, that they are wholly irreconcilable. For myself, I am free to admit that I have either never been able to comprehend the rule or I have not been able to subject my mind to the conviction that it is founded in good reason. It appears to me that if it ever was adapted to promote the ends of justice, it must have been at a period long past, and in a community limited to a small space, where the common mode of expression was subject to few or no exceptions of provincialisms or terms of art, or] where there were but few contracts, and these drawn up by professional men who used no words not familiar to the judge.
With us, where almost every man draws up his own contract, it would have a great tendency to defeat not only the ends of justice, but what appeared to the parties to the contract, the clear and obvious intent of the language they had used. Were it required that such contracts should always be in terms clearly understood by the judge or the contract be held void for want of certainty, it is very certain that contracts would often be defeated. To my mind the very term *(272) “ ambiguity ” appears to present the fact of an intention to be inquired into and explained. Johnson, in bis dictionary, defines it to be “doubtfulness, uncertainty, double meaning” — Webster, “doubtfulness or uncertainty of signification from a word being susceptible .of a double meaning.”
In construing a will or any instrument of writing creating a contract, the well known and established rule of construction is, to carry out the intention of the parties, and when either of the above definitions of ambiguity is presented, the fact of the intention must be ascertained. If the ambiguity arises from the use of words not understood by the judge, the will or the contract would, according to Lord Bacon’s rule, be void for want of certainty. Are not the consequences of such a rule alarming?
No man not acquainted with law could be depended upon to write the most simple and ordinary contract, lest he might use a word that, however familiar and well understood by the parties, might not be known to the judge. But suppose the judge should undertake to construe the ambiguity by declaring the intent, would he not be deciding on a fact that belonged to the jury? It has always to me appeared. to beso. The objection to resorting to parol testimony to explain an ambiguity in a written contract is, that thereby you make a secondary evidence control that of a higher degree, the written contract. This would be the case if such testimony were admitted to explain the intention where there was no ambiguity, but it would not be true where there was an uncertainty from the language employed. The extraneous circumstances would not be resorted to for the purpose of controlling the contract and engrafting a new one on such proof, but for the purpose only of explaining and understanding feraly the meaning of the parties who had used such words of doubtful signification. "Words are always to be taken in the common sense in which they are used, but it is not possible for the judge always to know the meaning of words in every place or condition in life. It is as much impossible as it would be for him to understand any language or tongue spoken. The very same words are often used in a very different sense, under different circumstances and at different times and places. For instance, in a place where there are /a great many credit transactions and no depreciated bank bills in circulation, and there was much of such currency used in trade, a promissory note payable in bank bills would mean, in such bills as were equivalent to gold or silver. But let a change come and a period of adversity and general depreciation succeed, the very same words would be used with a different meaning, and would certainly be referred to such bank bills as were *(273) in common circulation, at their average depreciation. No one, at such -a time and under such circumstances, in reading such a note could believe the party intended promising to pay in bills equivalent to specie. Again, it is not unfrequent that certain- provincialisms or terms of art may be used, and those very words may, in other places, have a different or no meaning at all. The case referred to by Judge Cowen, of the promissory note payable in deal, is strongly and strikingly illustrative. Now the judge might, in all likelihood, have construed the word deal to mean pine or fir lumber, if he had been compelled to give effect to the note without resorting to parol testimony, or he might have said the note was void for want of certainty; but calling in the aid of testimony of persons in that part of the country, the difficulty was explained. It was found, in the sense it was there used, to mean work in the line of the maker’s trade. Was .there any violence done here to the contract by the introduction of such testimony? Clearly not. It created no new'or reformed contract, but only rendered the one already made clear and free from doubt. Judge Story, in the case before cited from Mason’s Reports, gives another instance equally in point. The judge says, “if, by a written contract, a party was to assign his freight in a particular ship, it seems to me parol evidence might be admitted of the circumstances under which such contract was made, to ascertain whether it referred to goods on board the ship or to an interest in the earnings of the ship; or, in other words, to show in which sense the parties intended to use the term.” In the case thus put, we will suppose the fact in evidence that the assignor had at that time no interest in the ship itself, but only goods on board, is it possible that Lord Bacon’s rule must be received, whilst we shut our eyes on the palpable conclusion that he meant the goods and not the ship sent? That would be the result of the application of the rule. Nor can we believe that in this, any more than in the preceding case, the contract would be changed by such evidence. The current of the decisions evidently is, if not to disregard altogether Lord Bacon’s rule as to patent ambiguities, to enlarge the exceptions to it as far as that can be done without violating the rule that parol evidence is not to reform or engraft a new contract on the old, but only to explain the intention -of the parties.
We will now endeavor to apply the principles we have discussed or deduced from authority to the case before us. The note was for one hundred and twenty-five dollars, Terns money, at its current price at New Orleans. If it had stopped at the word “dollars,” there would have been no uncertainty in it and nothing left for explanation; *(274) but the words following “ dollars ” create the uncertainty. It meant that the amount named in the note should be paid in Texas money or its equivalent in specie; or the amount should be in specie by paying enough of Texas money to be equivalent to that amount. The history of the currency of Texas for the last seven or eight years will forbid the conclusion that the parties meant by Texas money, gold or silver. It would seem, then, that according to the authority of the cases we have examined, the uncertainty in the note ought to have been explained, if it could be done by extraneous testimony and that it should have been left to the jury to say what was the intention of the parties. "We might also add that in this case, if we had been of the opinion that the note did not present any uncertainty, but that it might have been properly construed by the judge, we are strongly inclined to believe that the construction given was wrong.
But being fully satisfied, however, that the testimony offered in the court below ought not to have been rejected, judgment is reversed and the cause remanded, with directions to the court to award a venire de novo.