## PILMER v. THE BRANCH OF THE STATE BANK AT DES MOINES.

| 16 | 321 |
| 79 | 243 |
| 16 | 321 |
| 89 | 690 |
| 16 | 321 |
| 92 | 374 |
| 16 | 321 |
| 126 | 198 |

1. EVIDENCE: DEDIMUS. Where depositions are to be taken by virtue of a *dedimus* the requisition of the statute is express that the names of the proposed witness shall be given.

2. SAME. The notice of suing out a *dedimus* and the *dedimus* itself identified the witnesses whose deposition would be taken, as one V. "and such person or persons as were acting tellers or cashiers of the Marine Bank of Chicago," on a day named, under which the deposition of one D. was taken, in which he stated, that he was the cashier of said bank. It was ruled, that the witness was not sufficiently identified.

3. WAIVER OF DEFECT IN DEPOSITION. Exceptions to depositions on file, on the ground of insufficiency of the notice under which they were taken, will be deemed as waived if not filed before the commencement of the trial.

4. CONTRACTS: CONSTRUCTION. Where a contract has been reduced to writing, the intention of the parties must be collected from the instrument itself, regard being had to the subject matter and the situation of the parties. (*Field* v. *Schricher*, 14 Iowa, 119, 122.)

5. SAME: MEANING OF WORDS. Words employed in a contract in writing are to be understood in their plain, ordinary and popular sense, unless in respect to the subject-matter, by known usages they have acquired a peculiar sense distinct from the proper sense, and then they will be construed according to such peculiar meaning.

6. SAME: COTEMPORANEOUS AGREEMENTS. Cotemporaneous conversations and agreements are inadmissible in an action on a written contract, for the purpose of showing the meaning or intention of the parties.

Pilmer v. The Branch of The State Bank at Des Moines.

7. SAME: USAGE AND CUSTOM. In an action on a written contract, it is competent to show by parol evidence that words used therein had, at the time such contract was entered into, a local meaning different from their usual signification, and that this was known to both parties who contracted with reference to such meaning.

8. SAME: CURRENCY. In an action on a draft payable in "currency," parol evidence is admissible to show the peculiar meaning of the word "currency" at the time when and place where the draft was drawn, and that the parties entered into the contract with knowledge of such peculiar meaning.

*Appeal from Polk District Court.*

FRIDAY, JUNE 10.

ACTION by the payee against the drawers of the following instrument

"No. 2646. The Branch of the State Bank of Iowa, at Des Moines.

"*Des Moines, May 22d*, 1861.

"Pay to the order of Philip Pilmer, *in currency*, one hundred and thirty six $\frac{90}{100}$ dollars.

"HOYT SHERMAN, Cashr."

"To Marine Bank, Chicago, Ill."

The petition alleged due demand, protest and notice of non-payment to the defendant. The answer admits the drawing of the bill by the defendant, and sets up the following defense, viz.:

That on the 8th day of May, 1861, the plaintiff made with defendant a special deposit of exchange on Chicago, payable in currency, on presentation, that is, payable (as alleged) "in the currency of the banks of the State of Illinois, which were much depreciated, and which were of the value, upon the average, of seventy-five cents on the dollar; but this deposit was made with the express agreement that the plaintiff should be entitled to exchange on Chicago, which should draw currency of the same character as that called for by the deposit made by him." That the draft in suit

was drawn in accordance with this contract; that when presented the drawee tendered currency of the same character as that called for by the draft which plaintiff had deposited with defendant, and the holder refused to receive the same; and that defendant has still on deposit with the drawee said currency, subject to the presentation of the said draft.

Another defense upon which, however, no question arises on this appeal, was want of dilligence in the presentation of the draft in suit. Issue was taken upon these defenses and the cause tried by the court, who found for the defendant. The errors assigned relate to the reception of certain evidence by the court, the refusal to exclude certain evidence, and to certain special findings, and the final judgment of the court. Plaintiff appeals.

*Phillips & Phillips* for the appellant.

I. It is not the duty or province of the Court to ascertain what the parties may have meant by the word, currency, as contradistinguished from what the word itself expresses, but simply to determine the meaning of the word. 1 Greenl. Ev., §§ 275–278; *Carter* v. *Hamilton & Scott,* 11 Barb., 147; 2 Pars. Cont., 60; *Harkins* v. *Edwards & Turner,* 1 Iowa, 426; *Walker & Bros.* v *Manning,* 6 Id., 519; *Dugan* v. *Campbell,* 1 Ohio, 115; *Keith* v. *Jones,* 9 Johns., 121; *Smith* v. *Goddard,* 1 Ohio, 178.

II. The notice and *dedimus* under which the deposition of Dox was taken does not specify the name of a witness. It should have been suppressed.

*Finch, Clark & Rice* for the appellee.

I. The word *currency* is to be interpreted in the sense in which the parties used it. 1 Greenl. Ev., §§ 277, 278; 2 Phil. Ev., Cow. & Hill's Notes, 263; *Rich* v. *Rich,* 16 Wend., 663; *Thompson* v. *Sloan,* 23 Wend., 71

DILLON, J.—I. One assignment of error consists in the refusal of the Court to exclude, on the plaintiff's motion, the entire deposition of Hamilton B. Dox, taken on behalf of the defendants.    Defendants served a notice upon the plaintiff that they would sue out a commission empowering a designated and proper officer in Chicago, Cook county, Illinois "to take the depositions of J. R. Valentine and such person or persons as were acting tellers or cashiers of the Marine Bank of Chicago, on the 29th day of ——, 1861, and on the 4th day of June, 1861."

The plaintiff objected, *in limine*, to the sufficiency of this notice, as respects the tellers or cashiers, because their names were not given.    The commission, nevertheless, issued, pursuant to the notice authorizing the officer to take the deposition of " J. R. Valentine, or (and) the person or persons acting as teller or cashier of the Marine Bank of Chicago.    By virtue of this commission the deposition of Dox was taken, who testifies that he was the cashier of that Bank at the dates referred to.    Defendants, on the trial, moved to exclude the deposition, because of the insufficiency of the notice, but this motion was denied.

This Court has decided (*Mumma* v. *McKee*, 10 Iowa, 107) that, where testimony is taken in the State, on notice, it is not necessary in the notice to give the *names* of all the proposed witnesses.    The statute does not require it.    It is supposed that the party against whom the deposition is taken will attend personally, and cross-examine the witnesses who may be produced against him.    But when depositions are to be taken, by virtue of a *dedimus*, the requisition of the statute is express, that the *names* of the proposed witnesses shall be given.    No reason is shown why the name of Mr. Dox could not have been obtained in advance.    But it may be said that the object of the statute is to identify the proposed witness, and that this was substantially and sufficiently done by the notice.    Such,

unquestionably is the object of the statute. A party has only a conditional right to be present when depositions are *thus* taken (Rev., § 4082), and it is most essential that he shall be distinctly advised *who* is to testify against him, so as to enable him to prepare his cross-interrogatories. No identification is in general so good as the name of a person. But here the notice was not that the deposition of a specific person would be taken, but " such person *or* persons as were *acting* tellers or cashiers." Conceding that there may be cases where the name may be dispensed with, or other identification, be deemed equivalent, we do not think this is one of them.

But while the objection was taken at the time the notice and direct interrogatories were served upon the plaintiff, yet when the deposition was taken and returned into court, the plaintiff did not, as required (Rev., § 4088), make and file exceptions to the same before the commencement of the trial. (Rev., § 4089.) On the trial, after the plaintiff rested, the defendant offered in evidence the deposition of Dox. The plaintiff then objected, for the reasons which he had set forth and filed at the time of the suing out of the commission. As the plaintiff made and filed no exception to the deposition after it was returned, and as his objection to its introduction was made for the first time after the plaintiff had closed his evidence, the Court properly treated the plaintiff's objection as waived, and hence, though the notice was defective, the Court did not err in admitting the deposition in evidence.

II. The other assignments of error are of a more general nature, and it will conduce to brevity and clearness of view to discuss, generally, the nature of the instrument in suit, and how far and for what purpose extrinsic evidence may be received.

It will be borne in mind that the plaintiff's action is upon the instrument set out in the statement, and which, for

convenience, we will designate as a draft. This is essential to be noted, for evidence might be proper in a general action against a bank or banker, to recover the amount or value of deposits, which would not be proper where (as in the case at bar) the action is brought upon a *written instrument.* The case is one, then, where the general rules of evidence relating to the interpretation and construction of written contracts are applicable. And here the cardinal and well-known rule is, that these are to be so expounded as to carry out the intention of the parties, so far as the rules of language and the rules of the law will permit. But where the contract has been reduced to writing, where the parties have deliberately put their engagements into an authentic, permanent, written form, the law says that this is the final and only evidence of their meaning, and that the intention of the parties must be collected from the words which they have selected and employed, with which to express such intention, having regard to the subject matter and the situation of the parties. *Field* v. *Schricker*, 14 Iowa, 119, 122.

Under this rule, it is plain that courts cannot always, by construction, make the contract mean precisely what the parties meant, but it is their duty to do so, as far as the language used will permit. It was the just observation of Lord MANSFIELD, in *Pugh* v. *Duke of Leeds*, Cowp., 720, "that *usage* decides upon the force of language; and for courts of justice to determine words against the intention of the parties and against the generally received sense and acceptation of the words themselves, is laying a snare to entrap mankind."

And the words (according to the rule laid down by Lord ELLENBOROUGH, in *Robertson* v. *French*, 4 East, 135, and generally followed by text writers and others) "are to be understood in their plain, ordinary and popular sense, unless they have generally, in respect to the subject matter, or by

the known usage of trade, or the like, acquired a peculiar sense distinct from the popular sense of the same words," and then they shall be construed according to such peculiar meaning. Rev., § 29; *Schuylkill Nav. Co.* v. *Moore*, 2 Whart., 491; Phil. Ev. C. & H's N. part 2, ch. 7, 560; 1 Greenleaf, § 278; *Rindskoff Bros.* v. *Barrett*, 14 Iowa, 101; Id., 119.

It follows then, that we are to ascertain and gather the meaning and intention of the parties to the contract in suit from the words of that contract. All prior or contemporaneous declarations or understandings are merged in the written contract; and because so merged, direct and independent extrinsic evidence is not in an action at law, in the absence of fraud, admissible to show an intention different from that which is contained in the draft itself. *That* when properly construed (about which more will presently be said), is the only, the final, the conclusive evidence of the intention of the parties. See *Thompson* v. *Sloan*, and *Goblet* v. *Beechy*, cited, *infra ;* see also, numerous authorities cited to the point, C. & H.'s notes to Phil. Ev., part 2, 534; *Bigelow* v. *Collamore*, 5 Cush., 226; *Harper* v. *Gilbert*, Id., 417.

Such being the law, it is our opinion that all that part of the testimony of Hoyt Sherman, in relation to the deposit in April, 1861, by Smith, Smith's draft to the plaintiff against that deposit, payable on its face in "Chicago exchange," and the subsequent conversations or arrangement with the plaintiff himself, and all similar evidence is, *in this action upon the draft, incompetent for the purpose of showing the intention and meaning of the parties to the draft.*

In consonance with this principle, it is held that, in an action on a promissory note or bill of exchange, the defendant will not be allowed to give evidence of an agreement between him and the plaintiff at the time of making the note or bill, that it should be renewed; and that payment should not be demanded on its becoming due. *Hoare*

v. *Graham*, 3 Camp., 57; *Hogg* v. *Smith*, 1 Taunt., 347. Nor to show that the liability of the makers to pay was contingent or different from the terms and legal effect of the instrument. *Myers* v. *Sunderland*, 4 G. Greene, 567; *Erwin* v. *Saunders*, 1 Cow., 249; 1 Hill (N. Y.), 116; 18 Johns., 45. The note or bill is the whole contract. *Pratt* v. *Gulick*, 13 Barb., 297; Phillips' Ev., 357, and notes; Story on Notes, § 57, *et seq.*

The draft in suit is payable "*in currency.*" And on the meaning and effect of these words arises the main contest between the parties. By the plaintiff it is contended that the words have a well known legal signification and that parol evidence to show that they had a local meaning, or an acquired peculiar meaning, or in short any meaning other than their general legal meaning, is incompetent. On the other hand, it is insisted that these words had acquired at the time the draft was issued a local meaning, different from their usual signification; that this was known to both parties who contracted with reference to this in the making and accepting of the draft, and that evidence is competent to show what this peculiar meaning is.

Currency is defined by Wharton (Law Lex. 236), as "bank notes or other *paper* money issued by authority, and which are continually passing as money." This view is substantially followed by the Supreme Court of Illinois. *Galena Insurance Company* v. *Kupfer*, 28 Ill., 332, when the judge delivering the opinion, says : "Currency is bank bills or other paper money which passes as a circulating medium in the business community as, and for, the constitutional coin of the country." "The term, 'current funds,' means current money, par funds, or money circulating without any discount." See also, *Lacy* v. *Holbrook*, 4 Ala., 88.

These definitions are too restricted. Currency is the circulating medium, and is generally used (and is, indeed, so defined by Worcester *voce* currency) to indicate "the aggre-

gate of coin, bills, notes, &c., in circulation; as "a metallic *currency;*" "a mixed *currency;*" and paper currency, &c. See acc. *Chambers* v. *George,* 5 Litt., 335; 3 Mon., (Ky.), 166; 2 J. J. Marsh, 463. Aside from extrinsic circumstances or a peculiar and acquired meaning, what then does a note or bill, payable *in currency,* call for? It calls for payment in any thing which circulates *current* as money. If gold and silver circulate as money, they are currency. If bank notes circulate as money, they are currency. Thus currency may be composed of either coin or paper or both. What, "currency" means in a note or bill is not very clear without some reference to the circulating medium at the time, or without knowing what meaning is attached to the word generally, by those who use it, or rather without knowing what specific idea the word is used to express. On questions of mercantile construction, we have frequently to follow the direction of TINDAL, C. J. (7 C. & P., 701), to the counsel in the case who was about to cite an authority: "You had better lay aside your dictionary and appeal to the knowledge of the jury; for, after all, the dictionary is not authority."

The meaning of words changes. It is curious to note how many words wholly lose their original or etymological meaning, and from usage and change of circumstances acquire sometimes an opposite and often a different meaning. See for example, the word "homestead," as illustrated by the case of *Hopkins* v. *Grimes,* 14 Iowa, 73. Take, for another example, the common legal word, *indorse,* from the latin *in,* upon, and *dorsum,* the back. It used to be applied literally and strictly to a writing upon the *back* of a paper. It is now well settled that a good indorsement may be made on the *face* of a bill or note. Story on Bills, § 204; 1 Stra., 18; 16 East, 12. If a payee of a note should write his name on the face of the instrument instead of on its back, it would be correct legal language to say that he *indorsed* it.

In *Rex* v. *Brigg*, 1 Strange, *supra*, the defendant was indicted for fraudulently erasing a payment *indorsed* on a note. The proof showed that the words razed out were written upon the *face* of the note, but this was adjudged no variance, and the defendant was convicted. This use of the word *indorse*, would, to a Latinist, appear to be a solecism; but an English judge or lawyer, who knows that usage fixes the meaning of words, accepts the enlarged or altered meaning without demur. Many words have so precise and specific a meaning, that no extrinsic aid is needed. Thus if a written contract should call for "*wheat*," no court would or ought to allow the party to show that wheat meant "barley." But if there is a difference in the mercantile meaning of the terms "good" and "fine," as applied to barley, evidence showing this difference may be given. *Hutchison* v. *Bowker*, 5 M. & W., 523.

The word *currency* is, as we have seen, far from having a settled, fixed and precise meaning. And, even if it had, such a meaning in general, it might acquire in certain localities, or among certain classes, a different signification.

Suppose, in consequence of a depreciation in the issue of banks generally, the word "currency" is set apart by general popular use, to indicate these issues, and to distinguish them from coin. If under these circumstances, the parties make a contract, and use the word *currency* in its local or popular sense, will the Court close its eyes to the situation of the parties, and enforce the contract in a different sense from that which was intended? Suppose again, for illustration, the circulating medium is divided into three well-known and well-defined classes: 1st, specie; 2d, bankable funds; and, 3d, currency: say specie is par, bankable funds two or three per cent discount, and currency twenty per cent discount. Suppose this is understood by every man in the community? If a person, under these circumstances, gives a note payable in *currency*,

is it right to say that the general meaning of currency is coin or its equivalent; and hence the maker must pay in a manner different from what the parties actually and really meant? To interpret contracts in this way is to incur the reproach of Lord MANSFIELD, by "laying a snare to entrap mankind."

We believe, upon examination, and contrary to our first impression, that where a note is payable *in currency*, no rule is violated in receiving evidence of the general and customary meaning of these words at the place where the draft is payable.

The case of *Thompson* v. *Sloan*, 23 Wend., 71, is in point, and illustrates the question under consideration as well as the one above disposed of, with respect to the testimony of Hoyt Sherman. A note was made, and dated at Buffalo, N. Y., for $2,500, payable at a bank in that city "in *Canada money*." "The plaintiff's counsel offered to read the note in evidence, to which the defendant's counsel objected, insisting that being payable in *Canada money*, it was not negotiable; that *Canada money* meant *bills of the Canada banks*. The plaintiff thereupon offered to prove that at the time of making the note, the makers thereof desired to have it drawn, payable in *Canada bank bills*, but that he objected, and insisted that it should be made payable in Canada money, which testimony was objected to and rejected." The Court, per COWEN, J., say: "That besides being irrelevant, it was inadmissible, because it was direct, independent evidence of intention, as explained by the parties at the very time of drawing the note. Everything of this kind, which the parties declared, was merged by the written agreement. The legal effect of a written agreement cannot be controlled by this kind of evidence." *Greeny* v. *Holly*, 14 Wend., 26; *Hurd* v. *Gallaher*, 14 Iowa, 394. "Nor, in general, can a patent ambiguity be obviated by it. I speak of the confessions and declarations of the

parties, which go to show what they meant by the words used in the writing. I do not deny that in such a case resort may be had to collateral circumstances." *Smith* v. *Doe*, 553; 1 Phil. Ev., 546; *Pirsch* v. *Dickson*, 1 Mason, 9, 11.

In the same case (*Thompson* v *Sloan*), the counsel for the defendant "offered to prove the meaning of the words *Canada money*, as generally understood at Buffalo by persons in trade there, which evidence was objected to by the plaintiff's counsel, but the objection was overruled and the defendants thereupon called several witnesses, who proved that *Canada money* was understood at Buffalo to mean *bills of the Canada banks.*" In the Supreme Court, Mr., afterwards President, Fillmore for the plaintiff, insisted that the judge erred in receiving parol proof of the meaning of the words *Canada money;* they are English words, well understood and not requiring explanation. As well might proof be received to show that the word *land* or the word *heir* had a peculiar meaning in a particular locality. But the evidence was adjudged rightly received. The Court says: "The cases are quite numerous, that though the meaning of a word be perfectly well settled in general language, yet if a secondary meaning has been affixed to it in commercial usage, in a certain region of country, or among certain classes of men, this may be shown; and when the proof is clear, the use of the word in that region, or among those men, carries into the contract the signification thus established."

A similar view was taken in the subsequent case of *Roberts* v. *Short*, 1 Texas, 373. There, a note was given for "one hundred and twenty-five dollars, *in Texas money*, at its current price in New Orleans." It was holden that parol evidence was admissible to fix the meaning and intention of the parties, by showing that the words "Texas money" meant Texas treasury notes. In the course of a

very able opinion, Ch. J. HEMPHILL makes the following remarks, which are strikingly apposite to the case at·bar: "Words are always to be taken in the common sense in which they are used. The very same words are often used in a very different sense under different circumstances and at different times and places. For instance, in a place where there are a great many credit transactions, and no depreciated bank bills in circulation, and there was much of such currency used in trade, a promissory note, payable in bank bills, would mean such bills as are equivalent to gold or silver. But let a change come and a period of adversity and general depreciation succeed, and the very same words would be used with a different meaning, and would certainly be referred to such bank bills as were in common circulation, at their average depreciation. No one, at such a time and under such circumstances, in reading such a note, could believe the party intended promising to pay in bills equivalent to specie." 1 Texas, 381, 382.

The course of decision in Kentucky, on this subject, remarkably exemplifies the correctness of these observations and of the view taken by this Court. *Chambers* v. *George*, 5 Litt., 335 (A. D. 1824); *Lampton* v. *Haggard*, 3 Monr., 149 (1826); Id., 166; 2 J. J. Marsh, 463; and see, also, *Cockrell* v. *Kirkpatrick*, 9 Mo., 688; and *Farwell* v. *Fay*, 7 Mo., 595 and 597. This last case was upon a note payable "in currency." SCOTT, J., says: "Experience has taught us that there is a wide difference between the currency contemplated by the law, and the actual currency. The parties must have had this in mind, or they would not have deviated from the usual course, but would have simply made the bill payable in dollars." 7 Mo., 597. Same reasoning by CATON, Ch. J., 27 Ill., 502.

The Illinois cases (*Galena Ins. Co.* v. *Kupper*, 28 Ill., 332; *C. F. & M. Ins. Co.* v. *Keiron*, 27 id., 502, and the still more recent and as yet unreported case of *S. M. & F. Ins. Co.* v.

*Treicher*, 30 Ill., cited in March No., 1864, of Am. Law Reg., p. 312), hold a different doctrine. But their force is much weakened by the dissent of Ch. J. CATON (see 27 Ill., 502), who holds parol evidence competent to show the meaning of the terms "currency," and "Illinois currency." And Judge DRUMMOND, of the Federal Court (*Newell* v. *Ins. Co.*), admitted parol evidence of this kind. The same may be said of *Morris* v. *Edwards*, 1 Ohio, 189. There was a divided court, and the case is opposed in its reasoning to the New York, Kentucky, Texas, and Missouri cases before cited. 23 Wend., 71; 7 Mo., 595; 1 Texas, 503; 5 Litt., 335; 3 Min., 149, 166; 2 J. J. Marsh, 463; and see also the recent case of *Rindskoff Bros.* v. *Barrett*, 14 Iowa, 101.

It follows, from the foregoing, that we are of opinion that the Court did not err in allowing the witness Allen to testify what "currency" meant in the general mercantile or business understanding at Chicago, for such was the substance and effect of his testimony.

The view above taken is so well illustrated by the case of *Goblet* v. *Beechy* (3 Sim., 24; Wigram on Ex. Ev., 139, cited in Cowen & Hill's Notes to Phil. Ev., part 2, page 533), that we cannot forbear to allude to it. Nollekins, the celebrated sculptor, by his will, bequeathed all marble, tools, "mod," &c. to the plaintiffs. Parol evidence of an attesting witness was offered to show that she read over the will to the testator, and when she came to the word "mod," she asked him what it meant, and he replied, "models."

The Court held this testimony inadmissible, but allowed an inquiry as to the meaning of the term *itself* from the testimony of sculptors.

Such evidence does not infringe the rule, disallowing parol evidence to vary, control, or contradict a written contract. 1 Greenl. Ev., § 292; *Rindskoff Bros.* v. *Barrett*,

14 Iowa, 101; *Hopkins* v. *Grimes*, Id., 73, and remarks of LOWE, J., pp. 80, 81.

On this part of the case, then, we conclude that extrinsic parol evidence of prior or contemporaneous conversations or contracts, is not admissible to show what the parties meant by the word " currency." in the draft in suit. But the evidence of bankers, business men and others, may be received to show what, in popular meaning or among' business men, bankers, &c., the word " currency " meant at Chicago at the date of the draft, which is the basis of the plaintiffs' action.

To vary its ordinary and general meaning, the proof should be clear and decisive, and to affect the plaintiff it must likewise be shown that he was cognizant of this special or acquired meaning, so as to make it certain that he accepted the draft with reference thereto.

For the errors above indicated in receiving portions of the evidence of Sherman, the judgment below will be reversed, and the cause remanded for a new trial. Costs in court below to abide event, in this court to be paid by the appellee.

Reversed.