OLLIE E. HULL et al., Appellants, v. JOHN B. MITCHELL,
Appellee.

**EVIDENCE:** Presumptions—Confidential Relations—Undue Influ-
ence—Deeds. The presumption that one occupying a close and
confidential relation with another exercised undue influence in
securing from such other a deed to valuable property, consti-
tutes substantive evidence of the fact, and such presumption is
very materially strengthened by a showing: (a) that grantor
was very sick at the time; (b) that grantor was without busi-
ness experience; (c) that the consideration was inadequate;
and (d) that the circumstances strongly indicated that grantor
was imposed on in the transaction. Evidence reviewed, and held
insufficient *to overcome the presumption.*

PRINCIPLE APPLIED: A widow, under a devise from her
husband, owned 240 acres of land, of a value of from $36,000 to
$48,000. She had no business experience, had no adequate
knowledge of values, had never made even the ordinary domes-
tic purchases, seldom left the farm, and had never ridden on a
railway train. After her husband's death, she allowed two of
her sons to farm the land absolutely as they saw fit. Even her
meager wants were poorly supplied by these sons. She sur-
vived her husband ten years, though in constantly failing
health. She was very sick and in much pain during the last
two months of her life, though rational until shortly before her
death. A year prior to her death, she executed a will devis-
ing her property equally to her several children, with one excep-
tion. One month before her death, she deeded the entire farm
to defendant, one of the sons who had farmed the land, for a
consideration of $18,000. No security was furnished. Defend-
ant gave his personal note for $18,000 at 4 per cent, due 15
years after date. A printed provision in the note under which
the payee might declare the entire sum due for nonpayment of
interest, and one in regard to attorney's fees, were scratched
out. The note provided that the mother should have a home on
the farm during her lifetime. Evidently, the defendant had
for years been planning to secure this deed. He had offered
"to divide" with another heir if the deed could be secured.
When the deed was executed, a physician was called in to de-
termine whether the mother was competent to execute it. The
deed was drawn by an attorney evidently acting in the interest
of defendant. His testimony as to what then occurred carried

an odor of improbability. *Defendant, since the father's death, had been his mother's sole and absolute manager, and had the fullest control of all her affairs.*

*Held,* not only to raise a presumption that the deed was secured by undue influence, but that the record did not overcome such presumption.

**WITNESSES:** Credibility—Interest and Bias—Attorney as Witness. The act of an attorney in combining the character of attorney and witness in a proceeding in which he is actively interested, and in which his testimony is vital, is a positive breach of professional ethics.

*Appeal from Mahaska District Court.—K. E.* WILLCOCKSON, *Judge.*

SATURDAY, APRIL 7, 1917.

REHEARING DENIED SATURDAY, SEPTEMBER 29, 1917.

SUIT to set aside and cancel a conveyance resulted in the dismissal of the petition. Plaintiffs appeal.—*Reversed.*

*Burrell & Devitt* and *S. V. Reynolds,* for appellants.

*D. W. Hamilton* and *L. T. Shangle,* for appellee.

LADD, J.—Evaline Mitchell died February 6, 1913, at the age of 79 years. Her husband had departed this life on January 30, 1903. Eight children survive her, being the plaintiffs, defendant, and William, Llewellyn and Elmer Mitchell. Since suit was begun, Amy Timbrel has withdrawn therefrom. The decedent conveyed to the defendant, on January 2, 1913, 240 acres of land, described as the S. E. ¼, the N. E. ¼ of the S. W. ¼ and the S. E. ¼ of the N. W. ¼, of Section 28, in Township 77 North, Range 16 West of the 5th P. M.

1. EVIDENCE: presumption: confidential relations: undue influence: deeds.

The sole issue raised by the pleadings is whether the execution of this deed was procured by the exercise of undue influence on the part of defendant. The consideration

named in the deed was $18,000, but the land was fairly
worth, according to five witnesses called by defendant, $150
per acre, while three witnesses called by plaintiffs esti-
mated its value at from $175 to $200 per acre, and two
others at $175 per acre.   No security other than a promis-
sory note was given for the payment of the consideration,
and the note was in words and form as follows:

"No......         Oskaloosa, Iowa, January 2, 1913.

"On or before the 2nd day of January, 1928, for value
received, I promise to pay Evaline Mitchell or order Eigh-
teen Thousand Dollars with interest at 4 per cent per annum
from date until paid, payable annually.   Should any of
said interest not be paid when due, it shall bear interest
at the rate of 4 per cent per annum from time the same
becomes due, payable annually, ~~and upon a failure to pay
any of said interest within thirty days after due, the holder
hereof may elect to consider the whole note due, and it may
be collected at once.   If suit is brought to enforce the col-
lection of this note, a reasonable attorney fee shall be allow-
ed and taxed up with the costs in the case.   If the holder of
this note is willing, we consent that a Justice of the Peace
shall have jurisdiction for collection of the same.~~
Maker has option of paying any amount upon principal of
this note at any time.
"$18,000.00                        John B. Mitchell.
"Payable at home of payee."

The last sentence was written, and all else printed, ex-
cept the signature.   It is to be noted that the interest
rate is 4 per cent per annum, and interest due and unpaid
to bear interest at the same rate; but the printed portion
authorizing the payee to declare the note due 30 days after
failure to pay interest matured, was stricken out, and also

the attorney's fee clause. The defendant might then delay
the payment of interest and principal for 15 years after
the conveyance of the land, and the only provision for care
and support left to the decedent after the transaction was
the clause in the deed reserving to her "a home upon said
premises the same as I have heretofore enjoyed since the
death of my husband, without charge." Prior to his death,
the husband is shown to have transacted all business for
the family, buying all household supplies, even the wearing
apparel of his wife and children. She seldom left the farm,
and had never ridden on a railroad train. After the hus-
band's death, she continued on the farm as before, and did
not go to New Sharon and Oskaloosa, their trading points,
more than half a dozen times during the 10 years prior to
her death. Though left the 240 acres of land in controversy
by her husband, she never leased it, but allowed her sons
William and defendant to operate the same, without any
agreement as to the income. After 2 or 3 years, defendant,
according to his story, bought her chickens and cattle, but
could not say how much or when he paid for them. He
testified that her hogs and one horse died, leaving as her
only personal property the horse "Old Kentucky," which
survived her at the ripe age of 32 years; that all chickens
and stock on the place during the 7 or 8 years before her
death belonged to him and William; that he gave her
what money she wanted; that she had $150 when taken
sick, which she told him to get so as to pay those who
helped care for her, but that he had used the money in
doing so. Other evidence disclosed that she left only 15
cents in her pocketbook, and had repeatedly complained of
not having been provided with money with which to buy
clothing.

When Llewellyn Mitchell left the farm does not appear,
but it was several years prior to decedent's death. Defend-
ant was the youngest child, and helped in the house, had

charge of all business transactions after his father's death, and "spent a good deal of time hunting, fiddling, dancing and trapping." The evidence tended to show that decedent was rational until shortly before her death, but without experience in business matters, and knew little concerning the values of property. She began failing in health when her husband died, and was taken with her last sickness in November, 1912. On December 11th, Dr. Childress found her "suffering a great deal of pain," and testified that "she was desperately ill. I didn't know that she would die, but I didn't know how long she would live." He says further that "she got weaker physically of course, constantly, until she finally died." Dr. Phillips, her regular physician, began treating her November 13, 1912, and called frequently until her death. She had been afflicted with a varicose ulcer near the ankle. He testified that she was suffering from this and senile gangrene when he first called; that she suffered much pain nearly all the time, but more at night, and that, owing to her age and loss of sleep, she became worn out; that opiates were administered to relieve her from pain; that her circulation was bad and her arteries hardened on account of old age, and that she got worse gradually.

What we have said indicates the situation and the condition of the decedent January 2, 1913,—without business experience, weak of body, borne down by pain, and looking to the defendant, who had dominated her activities for years, for care and support. According to his sister Mrs. Momyer, decedent was entirely under the influence of William and defendant, and defendant had proposed to this sister, on December 25, 1912, that if she would help him buy the place for $40 an acre, he would divide with her, or if she could get decedent to sell for $40 an acre, he would pay her. Mrs. Crookham, another sister, testified that, on the day her mother died, she had said to defendant:

" 'There is going to be trouble from this,' I said; 'you know a deed like this cannot stand, the shape ma was in; you know this place is worth $200 per acre;' and he said, 'I reckon I know it is worth $200 per acre.' I said, 'If you wanted this place you ought to have got her to deed this place to you while she was capable of making a deed;' and he said, ' I have been trying for ten years.' "

The defendant was asked whether he said to Mrs. Momyer that he would divide with her if she would get her mother to sell the land to him at $40 an acre, and he answered:

"I never remember of it. I never said it at any time. I did not at any time make any proposition to anybody to buy the farm at $40 per acre."

He admitted having a conversation with Mrs. Crookham, but swore that the farm was not worth to exceed $75 per acre; that he had not talked with his mother as to its value; but, on cross-examination, he was asked:

"Didn't you say to her that you could not afford to pay more than $75 an acre? A. I didn't state it just that way. Q. You don't believe now it is worth more than $75 an acre? A. I don't believe I do. * * * Q. The fact of the matter is you never talked to her? A. I talked to her. I never said what the land was worth. Q. You never had any opinion as to what it was worth? A. I never had any opinion except $18,000. Q. You said the land was worth $18,000? You said you could pay $18,000 and that is what it was worth? A. She said she didn't want me to give any more than I wanted to. Q. She did say to you, and she said to your sister and Mrs. McIntosh, that she wanted you to pay for that land what it was worth? A. She didn't say that to me. Q. You claim you paid all the land is worth? A. I paid all I thought I could pay."

If defendant had been kind to his mother, he also had

enjoyed with William the use of the farm without other consideration than providing for her meager wants, and that she did not think him entitled to any preference over the other children appears from her will, executed February 11, 1912. That therein she should have denied Mrs. Momyer the benefit of her bounty on the specious ground that she had been remembered by her afflicted sister, to whom she had opened her home, but emphasizes her inability to measure claims on her bounty. In the will she directed: (1) the payment of debts, expenses of last sickness, burial, and settling her estate; (2) the release of all claims for rents against defendant and his brother William; (3) bequeathed to her daughter Jennie Momyer the sum of $200, saying that she gave no more because of this daughter's having received the estate of another daughter, deceased (Mae Mitchell); and (4) left the residue of the estate, share and share alike, to Llewellyn, Elmer, William and John (defendant), Ollie Hull, Addie Crookham and Amy Timbrel. Though expressing in the most solemn manner her purpose of distributing her estate share and share alike to her children, with one exception, she appears to have changed her mind within eleven months, and to have concluded to give more than half to one and permit him to share with the others in what remained! Mrs. Landstrum related that she accompanied Mrs. Hull, a daughter of decedent's, in calling on her, January 25, 1913, and that:

"They asked her if she wanted Johnny to have more than the others, and she said 'No.' She said that he didn't pay her enough. At this time she was bedfast. She was poor and evidently was wasted away a good deal since I had seen her last."

Much of the testimony given by the daughters of decedent was incompetent, under Section 4604 of the Code, and for that reason is not referred to. The record leaves no doubt that decedent desired the farm to continue in the

family, and, to accomplish this, was willing to sell it to defendant for less than she would require of a stranger. Dr. Phillips testified that she said, in the evening the deed was made, that she "wanted to get rid of being bothered with it," and wanted to "sell it to John, * * * didn't want the worth of it." He had been sent for to pass on whether she was competent to make the deed. How she had been troubled with the farm does not appear, for William and defendant had always managed it to suit themselves. The record, in short, shows that this woman was without business experience; that she had a scant appreciation of values; that defendant had been amply compensated in the use of the farm for all he had done for her; that she had gradually become weaker under the weight of years and disease, and had for many years depended entirely on defendant for the management of her estate and the transaction of all of her business,—so entirely that she did not participate therein. In other words, he was not only her agent but the absolute manager, and had full control of all her affairs, and this relation warrants the presumption that he procured the execution of the deed by undue influence. *Drefahl v. Rabe,* 132 Iowa 563. This presumption, arising from the confidential relation of agency, is greatly strengthened by proof of her physical condition, inexperience in business matters, and her entire reliance on him, want of adequate consideration, and the nature of the transaction. *Fitch v. Reiser,* 79 Iowa 34; *Spargur v. Hall,* 62 Iowa 498; *Curtis v. Armagast,* 158 Iowa 507.

2. WITNESSES : credibility : interest and bias : attorney as witness.

No evidence tending to rebut this strong presumption was adduced, other than that of the attorney who prepared all the papers referred to, and it only remains to ascertain whether this is sufficient to meet and put in equipoise such presumption of undue influence. See *Graham v. Courtright,* 180 Iowa 394. He had been in charge of the

defense from the beginning, and actively participated in the trial. He must have been aware, even before employment, not only that he would be called as a witness, but of the controlling importance of his testimony. The impropriety of undertaking to unite the character of counsel and witness has been adverted to in other decisions. *Alger v. Merritt,* 16 Iowa 121; *Fletcher v. Ketcham,* 160 Iowa 364. Without further comment on this breach of professional ethics, it is enough to say that the assumption of the dual relation has an important bearing on the credibility of the witness. *Ross v. Ross,* 140 Iowa 51. He testified to having advised the making of the will by decedent to avoid trouble with her daughters over her omission to exact any rent from defendant and William for the use of the farm, but that the terms of the will were in accord with her wishes; that he had never met her previous to that time; that he was at her home December 14, 1912, and that, while he was there, she talked to him about the value of the farm, her right to sell it after having made a will, whether she could do so for less than it was worth, whether she had mental capacity so to do; and that she then said she was willing to sell to defendant at $100 per acre, and that "we couldn't get much out of John (defendant). He didn't think he could pay that much;" and, advising her to think the matter over, and saying he would return whenever she wished, he departed. By whom he was called does not appear; but, in about two weeks. defendant dropped into his office, and remarked that "he guessed she had made up her mind." The witness could not go then, and, some days later, telephoned defendant to meet him at Lacy in the afternoon of January 2, 1913. Llewellyn met him instead, and they reached the house at about 8 o'clock. Dr. Phillips was sent for to pass on decedent's mental condition as being such that she could execute a

deed, and, according to the witness, decedent inquired of defendant what he thought he could pay for the land, and defendant said he thought he could pay $75 per acre, and would not undertake to pay $100 per acre, and this was all he would say; that she concluded to sell it for that, and that then the witness directed all but decedent to leave the room, when he asked her:

"'Are you selling this farm to Johnny because you want to sell it, or are you selling it because he wants to buy it; because,' I said, 'if you don't want to sell this place you don't have to.' I said, 'You need not think you need to make a deed here this night because I have come here to make a deed;' and I said, 'I can take my deed and go away, just as I did before.' She said she had always wanted Johnny to have the place, and the place was run down and not fixed up and she could not do that, and if she sold it to Johnny, he would go ahead and fix it up. I says, 'Grandma, you remember when I was here before and I told you I thought this place was worth $150 an acre. Dr. Phillips thought it was not worth that much; he put it at $125 an acre. I am nearer right than he is, and whatever price you sell it to Johnny for less than $150, you can figure you are giving him just that much.' She said, 'I want to sell it to him at a price I know he can pay for it, and at a price that is not too low to make the rest dissatisfied.' I said, 'Grandma, that is an awful hard thing to do.' I said, 'Grandma, this thing of selling your home is a pretty serious proposition. I have known lots of people to sell their homes and get full price for them and afterwards been sorry for it.' I said, 'If you are going to wake up tomorrow morning and wish you hadn't done it, you want to call it off right now; it will be too late to do it then.' She said 'No;' she had thought about it and she was satisfied; and I said, "Up to this time you have had the boys

here, these boys have been living with you.  If you sell this place to Johnny, it will be their home then, and instead of the boys living with you, you will be living with them, and that may not be as pleasant.  Johnny may get married and bring some wife in here, and conclude you was in the way;' and she said, 'You put it in that deed that I am to have a home here just as I have had as long as I live.'  I stopped making any objections then, and was satisfied that it was her sincere wish to make the sale, and I went and opened the door and told the rest of them they could come in."

He then called the others in, and prepared the deed and note, and they were signed and delivered.  On cross-examination, he was asked, "Who did you represent?  A. Nobody's attorney there;" and he explained that he understood it to have been his duty to see that Mrs. Mitchell understood what she was doing.

"Q.  You are entirely familiar with the custom and practice where a man sells land to another?  A.  Yes, sir. Q.  How the vendor protects himself?  A.  Yes, sir.  Q. You never suggested that Mrs. Mitchell take a mortgage back to protect herself?  A.  Yes, sir.  She would not take a mortgage from her own son.  I had a blank mortgage with me.  I told her about it.  I said, 'Grandma, if you were selling this farm to a stranger, you would take a mortgage back.'  But she would not take a mortgage from her own son.  Q.  But, of course, if you are selling it to your own son, a mortgage is entirely unnecessary?  A. She didn't want to take a mortgage.  Q.  She didn't want to take a note?  A.  Yes, she wanted the note.  Q. She had no objections to taking a note from her son?  A. None whatever.  Q.  She didn't want to secure that note by a mortgage on the property?  A.  No, sir; she didn't want any mortgage.  Q.  You are familiar with the ordinary form of promissory note?  A.  Yes, sir.  Q.  They

are printed generally in a regular form? A. Yes, sir. Q. I will ask you if you think that, in scratching out that printed portion of this note for $18,000 you did that—you did erase that printed form for protecting the interests of the old lady? A. When anyone comes into my office, a couple of people to make a contract, I make their contract out for them the way they want it made, and I was making a contract for the two people here. They were making their own contract, and I scratched out what I was directed to scratch out."

He then explained that defendant wanted to pay only 3 per cent, but that she wanted 4 per cent, and testified that:

"That was the arrangement between them. He was to pay 4. Q. The 4 per cent interest, and you also struck out of the note the clause which provides on failure to pay interest it makes the whole sum due? A. That is stricken out. Q. In other words, this note as it was originally printed provided that, on the failure to pay the interest—the annual interest—when due, the whole sum became due, and you cut that out, protecting the old lady's interest? A. I do not think that was a protection to her interest to cut it out. Q. Why did you do that? A. Because it was their arrangement. Q. In other words, she wanted to arrange a contract whereby, if he didn't pay her this 4 per cent annually, she could not force him to pay it to her for 15 years? A. I do not know as that was said, anything of that sort, there. * * * Q. You cut the acceleration clause that is in the usual notes, in notes which are going to run for years? A. I cut that out. Q. Will you say that you did that at the old lady's request? A. I cut it out to comply with their mutual arrangement. Q. In other words, what the old lady wanted to do is to sell that farm for less money than she ought to, and make it impossible to enforce the payment of the principal and interest? A. They talked over how much

money the old lady wanted, and the interest was figured up as $750 a year, and John said she could have that much money, and any time she wanted more he would get it for her."

He admitted having advised a person who had refused to inform him what she knew about the case and did not wish to testify:

"If you don't want to tell anything on the witness stand, don't tell them (plaintiffs or attorneys) about it; they won't know how to ask you about it."

It is not to be overlooked that the alleged conversation with decedent in private cannot be contradicted by any witness; that he has a remarkable memory for details, and that he does not relate the conversation had in negotiating the terms of the note and concerning security therefor, stating his conclusions. Moreover, others must have been present during such negotiations, for he testified that all had been invited to come into the room, and yet none of these corroborated his story of the arrangement between decedent and defendant concerning the terms of the note. That he should have allowed decedent to accept a note, unsecured, on which neither principal nor interest could be collected within 15 years, without protest on his part, casts some doubt on his pretense of having undertaken to protect decedent's interests. That he should have gone from Oskaloosa to the home of decedent on December 14, 1912, and again on January 2d, following, without being employed by anyone so to do, is a little hard to believe. A settlement was made with one of defendant's sisters shortly before the trial, in which she was paid her supposed share of the note and promised an additional amount, which, with that paid, would be equal to her share of the estate if the deed should be set aside; and the agreement prepared by

this witness recited that it was "further based upon the consideration and is conditional upon the fact that the said Amy Timbrel shall not in any way seek to set aside said deed and sale of Evaline Mitchell to John Mitchell, or make any objections to the probation of the will of said Evaline Mitchell."

This sister, though testifying freely as to all matters of which she was incompetent to speak, under Section 4604 of the Code, was unable to remember anything to defendant's disadvantage. These matters cast doubt on the story of the witness, and, though in a general way he may have told the truth, the situation was such that he labored under a powerful temptation to embellish in order to meet the necessities of the occasion. He did not undertake to do so, however, as to the execution of the papers. The terms of the note were such, in connection with its acceptance without security, as to cast suspicion on the entire transaction, and the evidence leaves no doubt that such terms were dictated by defendant. And, as to them, the testimony of the attorney confirms rather than rebuts the presumption of undue influence. Nor are we inclined to the view that any explanation of value by this attorney freed decedent from the dominating influence of the defendant. Notwithstanding the attorney's talk as to the value, on December 14th, he found her, little more than two weeks later, fully persuaded to sell at $25 less per acre than she was then asking, though that was a third less than the property was worth. Defendant reported, several days before, that he "guessed she had made up her mind." No effort was made by defendant to show how this came about. He carefully refrained from telling his mother what the land was worth.

It may be that the attorney said all he claims to have said to decedent, but, if so, this may have been done in a manner so indifferent as not to arouse her to the need of protecting her own interests as against the influence of

him in whom she had reposed the most implicit confidence, or it may be that the decedent, aged and decrepit, racked with pain and in her last sickness, was not brought to a full appreciation of the consequences of the transaction. Whatever the attorney may have said, everything he did was inimical to the interests of decedent and in the interest of defendant, and, in the light of this record, it is all but incredible that he was acting for anyone other than defendant. In any event, we are fully persuaded, from a careful examination of the record, that his testimony ought not to be accorded probative force sufficient to meet the strong presumption of undue influence arising from the relations existing between the parties to the deed.

The trial court should have set the deed aside, and to enable it so to do, the decree is—*Reversed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.